**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **PAUL IZOR** and **APRIL HALE**, individually and on behalf of all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| *Plaintiffs*, | **DEMAND FOR JURY TRIAL** |
| *v.* | |
| **HEALTH INSURANCE INNOVATIONS, INC.,** a Delaware corporation, **FEDERAL INSURANCE COMPANY**, an Indiana corporation, **NATIONAL CONGRESS OF EMPLOYERS, INC.**, a Delaware corporation, **TELADOC HEALTH, INC.**, a New York corporation, and **BRIDGEVINE, INC.**, a Delaware corporation, | |
| *Defendants.* | |

## CLASS ACTION COMPLAINT

Plaintiff Paul Izor ("Izor" or "Plaintiff Izor") and Plaintiff April Hale ("Hale" or "Plaintiff Hale") bring this Class Action Complaint and Demand for Jury Trial against Defendant Health Insurance Innovations, Inc. ("HII" or "Defendant HII"), Defendant Federal Insurance Company ("Chubb" or "Defendant Chubb"), Defendant National Congress of Employers, Inc., ("NCE" or "Defendant NCE"), Defendant Teladoc Health, Inc. ("Teladoc" or "Defendant Teladoc") and Defendant Bridgevine, Inc., d/b/a ConsoliCare ("ConsoliCare" or "Defendant ConsoliCare") to stop the Defendants from violating the Telephone Consumer Protection Act ("TCPA") by making unsolicited, autodialed and/or prerecorded calls to consumers without their consent, including calls to consumers registered on the National Do Not Call registry ("DNC"), and to otherwise obtain injunctive and monetary relief for all

persons injured by the conduct of the Defendants.  The Plaintiffs, for this Complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## INTRODUCTION TO HII

1.     HII provides a cloud-based platform that grants access to insurance agents so the agents can offer insurance products and benefits to consumers for the benefit of the Defendant.[1]

2.     HII recruits and relies on health insurance brokers that run call centers who handle the majority of the insurance applications HII receives.

3.     This is an explanation of how HII operates using brokerages to solicit sales from consumers:

i)   A brokerage (or it is believed HII on behalf of the brokerage) will place solicitation calls to consumers in order to sell health insurance packages.

ii)  Once a consumer provides payment information, such as a credit card, HII will directly contact the consumer with the necessary paperwork on behalf of the insurance company the consumer will be signed-up with.

iii) HII will then provide the consumer with all of the materials necessary for the consumer's insurance plan and provide additional future services for the consumer, including customer support and claims administration.

---

[1] https://www.hiiq.com/about

4.      HII is fully aware of the business methods that are used by its broker network, which includes the use of prerecorded and autodialed phone calls, including calls that are made to consumers that have registered their phone numbers on the DNC.

5.      HII benefits financially from every sale that is generated by its broker network.

6.      HII directly controls, and is directly involved in the monitoring and training of, its broker network.

7.      HII has directly responded to complaints that have been posted online against HII regarding calls and behaviors demonstrated by its broker network.

8.      HII intentionally uses questionable call centers in order to prey on consumers.

9.      HII is directly responsible for the unsolicited autodialed and prerecorded calls that Plaintiffs and members of the classes have endured as a result of HII's control over brokers' calls and ratification of the unlawful telemarketing practices that lie at the core of this complaint.

**INTRODUCTION TO FEDERAL INSURANCE COMPANY**

10.     Federal Insurance Company is a subsidiary of Chubb Limited.[2]

11.     Chubb is a publically traded insurance provider that provides health insurance to consumers.[3]

12.     HII regularly generates leads for Chubb, offering Chubb supplemental life insurance among its many insurance offerings. In fact, in its investor package for 2018, HII

---

[2] http://s1.q4cdn.com/677769242/files/doc_financials/2018/AGM/Chubb_Limited_2017_Annual_Report.pdf
[3] https://www.linkedin.com/company/chubb/about/

promotes its relationship with Chubb as a reason why consumers choose HII.[4]

13.     As it pertains to the case at hand, Plaintiff Hale was offered a plan through one of HII's brokerages for Chubb insurance.

14.     When a consumer purchases a Chub insurance plan through HII, the consumer signs an enrollment form directly with Chubb.

15.     Chubb benefits financially from the illegal telemarketing practices that are employed by HII and its brokerages.

## INTRODUCTION TO NCE

16.     NCE provides consumers with a group of pre-selected supplemental insurance offerings.[5]

17.     HII-related agents and brokerages disclose details about benefits provided by NCE in each sales call:

---

[4]
https://investordeck.s3.amazonaws.com/documents/b4990a8d20f6486993aed02293fd6714_YWV17l5kkKgcQjmp1VTuA.pdf?AWSAccessKeyId=AKIAIYK6VHI5CSQ2BMIA&Expires=1554668103&Signature=YxGY3Wu9hgrZLtmN1qaMyNgmrf0%3D - Pages 15 and 16

[5] http://thence.org/about-nce/



## National Congress of Employers

NCE is the National Congress of Employers, a national association that represents America's small and medium sized businesses via networking, advocacy, and information sharing. The NCE seeks to provide its members with reliable services, resources, and benefits regardless of one's circumstances or means.

NCE Membership Benefits includes **GapAfford Plus** which gives members access to pre-negotiated, lowered rates on out-of-pocket medical expenses like.

- The Aetna Dental Access ® Network
- Prescription Discount Benefits
- Pet Rx
- Alternative Medicine
- Chiropractic Care
- Hearing Savings Program
- Imaging Savings Program

- Laboratory Savings Program
- Medical Bill Negotiations
- Medical Supplies and Equipment
- Physical Therapy
- Vitamins and Supplements
- 24/7 Health Information Line
- 24/7 Nurse Help Line

** Please note that There are no: • Deductibles • Pre-existing condition limitations • Medical exams • Claim forms • Limitation on usage

Disclaimer: Not affiliated with LifeShield National Insurance Co.

Confidential. Do not distribute. For agent use only.

13 [6]

18. All insurance agreements provided by HII require that the consumer register a membership with NCE:



Dear ▓▓▓▓▓▓▓▓

Thank you for requesting membership in National Congress of Employers (NCE) and payment is processed, your policy will go into effect 12:01 am on 04/03/2019. [7]

19. NCE benefits directly from the illegal telemarketing employed by HII and its brokerages.

### INTRODUCTION TO TELADOC

20. Teladoc provides consultation services to consumers by phone so consumers can get expert and licensed medical help.[8]

---

[6] https://www.hiiq.com/wp-content/uploads/2018/07/Vitalacare-powerpoint-1-1.pptx
[7] Portion of the agreement Plaintiff Hale was asked to sign – cover page
[8] https://www.linkedin.com/company/teladoc-health/about/

21.     HII partners with Teladoc and includes the services of Teladoc with each agreement.

22.     Consumers pay Teladoc approximately $29.99 per month when they purchase an insurance plan through HII:



23.     Teladoc benefits directly from the illegal telemarketing employed by HII and its brokerages.

### INTRODUCTION TO CONSOLICARE

24.     ConsoliCare is a group insurance provider that provides insurance packages on behalf of Chubb:



25.     HII offers ConsoliCare plans to consumers through its agents and brokerages.

---

[9] Portion of the agreement Plaintiff Hale was asked to sign – cover page
[10] https://www.hiiq.com/consolicare-sales-materials/

26.     Consolicare is paid a monthly fee for every plan HII sells on its behalf:



11

27.     Both Plaintiffs received at least 25 autodialed and/or prerecorded calls to their cellular phones made by or on behalf of these Defendants, despite the fact that Plaintiffs registered their phone numbers on the DNC in order to avoid such calls and never gave prior written express consent to be called in the first place. In addition, Plaintiffs opted-out from receiving additional calls numerous times, but still received additional calls made by or on behalf of Defendants.

28.     In response to these calls, Plaintiffs file this lawsuit seeking injunctive relief, requiring Defendant to cease from placing unsolicited autodialed and prerecorded calls to consumers' cellular telephone without consent and from otherwise calling telephone numbers registered on the DNC, as well as an award of statutory damages to the members of the Classes and costs.

<b>PARTIES</b>

29.     Plaintiff Izor is a Mount Hermon, California resident.

30.     Plaintiff Hale is a Spring, Texas resident.

31.     Defendant HII is a Delaware corporation headquartered in Tampa, Florida.

32.     Defendant Chubb is an Indiana corporation headquartered in Indianapolis, Indiana.

---

[11] Portion of the agreement Plaintiff Hale was asked to sign – cover page

33.     Defendant NCE is a Delaware corporation headquartered in Garden City, New York.

34.     Defendant Teladoc is a New York corporation headquartered in Purchase, New York.

35.     Defendant ConsoliCare is a Delaware corporation headquartered in Alpharetta, Georgia.

## JURISDICTION AND VENUE

36.     This Court has federal question subject matter jurisdiction over this action under 28 U.S.C. § 1331, as the action arises under the Telephone Consumer Protection Act, 47 U.S.C. §227 ("TCPA").

37.     This Court has personal jurisdiction over the Defendants and venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant HII resides in this District, Defendants do significant business in the state of Florida, and because the wrongful conduct giving rise to this case occurred in or was directed from this District.

## COMMON ALLEGATIONS

**Getting Insurance Through HII**

38.     HII utilizes its own sales force, as well as brokerages in order to sell insurance packages to consumers throughout the U.S.

39.     In the second quarter of 2017, brokerages accounted for 86% of HII's Individual & Family Plan applications:

While HIIQ publicly plays up its direct-to-consumer "Agile" channel (i.e. its own website), don't be fooled. **According to the company's own SEC filings, it generated ~86% of its Individual & Family Plan ("IFP") applications in 2Q from brokers (including both company owned brokers and 3 rd party brokers).** In fact, its direct-to-consumer **Agile segment saw a 15% decline in IFP applications in 2Q17, while its broker channel saw a ~68% increase in IFP applications.** In other words – brokered volumes drive this business. Without brokers, there would be no HIIQ.

[12]

40.     HII agents and brokerages provide health insurance plans that often include a significant insurance plan, such as one offered by Chubb, and then additional supplemental offerings that provide telephone consultation services, dental and prescription discounts.

41.     If the consumer agrees to purchase the package that has been prepared by HII, the consumer will provide payment information to the agent that sold the package over the phone. The consumer will then speak with a registered insurance agent who reads a script that was written by HII.

42.     After the credit card is provided, HII sends an agreement to the consumer that the consumer must sign. This agreement details all of the different insurance coverages and supplements that the consumer is purchasing. This is an example of the agreement, based on what Plaintiff Hale received:

---

[12] https://seekingalpha.com/instablog/38059736-the-friendly-bear/5048086-hiiq-100-percent-downside-problematic-broker-relationships

Dear ████ ███████

Thank you for requesting membership in National Congress of Employers (NCE) and applying for ConsoliCare. Once your application is approved and payment is processed, your policy will go into effect 12:01 am on 04/03/2019.

You will be charged $366.50 immediately for your first month of insurance coverage. Future charges to your account will be $339.00 and will be made on the 3rd of each month starting 05/03/2019.

**Your Coverage**

ConsoliCare Cost inclusive of monthly NCE Dues & Plan Cost
Federal Insurance Company
$96.51

Chiro & Podiatry Services
$19.50

Teladoc 24/7 doctor visits by telephone
$29.99

Association Dues
$12.50

Rx Helpline
$19.00

Health Education program (PEP)
Online health education & fitness training
$27.50

Freedom Spirit Plus Cost inclusive of monthly Med-Sense Dues & Plan Cost
Federal Insurance Company
$161.50 per month

Total
$366.50

By signing, you acknowledge you have reviewed and understand the details of your purchase and the charges related to your purchase.

Applicant Signature:                    Date:

43.     Within the agreement, the consumer specifically fills out a membership form for NCE. This form details what is included with the insurance package.

44.     The agreement also contains an enrollment form for Chubb, which the consumer must fill out and sign.

45.     Towards the bottom of the agreement is a consent form for the consumer to use the services of Teladoc, which the consumer must sign.

46.     When a consumer acquires an insurance plan through HII, the consumer is also acquiring insurance through a number of additional companies, for which HII acts as a broker.

**HII Uses Brokerages Who are Known to Use Questionable Business Practices**

47.    To begin with, HII accepted Matthew B. Panzer just 3 days after the State of Iowa took serious insurance disciplinary action against Panzer, who was accused of engaging in unfair and deceptive practices within the State of Iowa.[13]

48.    In another example, HII has done significant business with Steven Dorfman, and Dorfman's related companies, including Health Benefits One, LLC, Simple Insurance Leads, LLC and the d/b/a Simple Health.[14]

49.    It is estimated that according to HII's 2016 annual report, Dorfman's companies accounted for 65.2% of HII's advanced commissions:

*Advance commission arrangements between us and some of our third-party distributors expose us to the credit risks of such distributors, which could in turn have an adverse effect on our business, financial condition, and results of operations.*

We make advance commission payments to many of our independent distributors in order to assist them with the cost of lead acquisition and provide working capital. As of December 31, 2016, we had a balance outstanding for advanced commissions of approximately $37.0 million under such arrangements of which approximately $32.6 million is with three distributors. Of the three, one distributor accounts for approximately $24.1 million, or 65.2% of the total outstanding balance. In most cases where we make advance commission payments, we receive security interests in collateral, as well as personal and entity-level guarantees. At a minimum, our collateral includes a claim against all future compensation owed to the distributor for all products sold. As a result, our claims for such payments would usually be considered secured claims. Depending on the amount of future compensation owed to the distributor, we could be exposed to the credit risks of our third-party distributors in the event of their insolvency or bankruptcy. Where the amount owed to us exceeds the value of the collateral, our claims against the defaulting distributors would rank below those of certain other secured creditors, which could undermine our chances of obtaining the return of our advance commission payments. We may not be able to recover such advance payments and we may suffer losses should the independent distributors fail to fulfill their sales obligations under the contracts. Accordingly, any of the above scenarios could harm our business, results of operations and financial condition.

[15]

As the above image shows, in 2016 Dorman represented $24.1 million in advanced commissions.

50.    In mid-2017, Simple Health was linked to a health insurance scam, in which it is alleged that Simple Health posed as Blue Cross and Blue Shield of Nebraska.[16]

---

[13] https://iid.iowa.gov/documents/enforcement-orders-and-actions/in-the-matter-of-matthew-b-panzer
[14] https://seekingalpha.com/instablog/38059736-the-friendly-bear/5048086-hiiq-100-percent-downside-problematic-broker-relationships
[15] https://last10k.com/sec-filings/hiiq/0001564590-16-014141.htm
[16] https://ago.nebraska.gov/news/bcbsne-scam

51.     Prior to the incident in 2017, Dorfman had experienced other legal challenges, including a Cease & Desist Order by the Nebraska Department of Insurance in January, 2012.[17]

52.     Despite records of Dorfman's legal troubles, HII still certified him as one of its main brokerages.

53.     HII also uses, or has used Michael C. Tobias, of Tovias & Associates Inc., as one of its certified brokers.[18]

54.     Tobias has even worked directly for HII. According to the Montana Proposed Agency Action against HIIQ et al,[19] there is a claim that Tobias functioned as a Senior Vice President for HII.

55.     In a video posted on Vimeo, Tobias speaks about the success his brokerage achieved directly on behalf of HII using a predictive autodial system:





**Hi-Tech Dialer Welcome**

[20]

---

[17] https://seekingalpha.com/instablog/38059736-the-friendly-bear/5048086-hiiq-100-percent-downside-problematic-broker-relationships
[18] https://seekingalpha.com/instablog/38059736-the-friendly-bear/5048086-hiiq-100-percent-downside-problematic-broker-relationships
[19] http://csimt.gov/wp-content/uploads/Notice-of-PAA.pdf
[20] https://vimeo.com/129693329

56.     It should come as no surprise, in light of the above video that Tobias has been accused of placing unlawful prerecorded telephone solicitations to consumers.[21]

57.     Despite the obvious fact that Tobias uses a predictive autodialer and placed prerecorded calls, HII still used Tobias and his company, or companies as part of its group of brokerages.

58.     There are numerous other examples calling into question the brokerages that HII has chosen to use as its sales force.[22] What has become clear is the fact that HII ratifies the illegal telemarketing methods used by its brokerages, presumably due to the financial benefits HII receives based on those methods.

59.     It is estimated that Simple Health alone handled over 62 million calls with consumers, with HII receiving a share of the profits from each sale generated through illegal telemarketing.[23]

**HII Exerts Control Over All of Its Brokerages**

60.     HII is directly involved in the business practices employed by its network of brokerages, including by approving and revising call scripts, exemplifying another reason why HII is responsible for the illegal telemarketing its brokerages engage in.[24]

61.     HII provides brokerages with access to nearly 50 scripts that agents must read prior to every insurance package purchase. These scripts are read verbatim to the consumer.[25]

62.     Upon information and belief, HII instructs its brokers to use the name "Health

---

[21] http://ttcpa.oklahoma-isp.net/telemarketers.html
[22] https://seekingalpha.com/instablog/38059736-the-friendly-bear/5048086-hiiq-100-percent-downside-problematic-broker-relationships
[23] http://www.aureliusvalue.com/research/hiiq-boiler-rooms-worthless-policies-and-defrauded-families/
[24] http://aureliusvalue.com/content/uploads/2018/11/Lovely-Seraphin-Declaration.pdf
[25] https://www.hiiq.com/agent/author/asilversteinhiiquote-com/

Enrollment Center" when calling consumers.

63.     Research of counsel reveals that Number One Health Insurance and Donisi

Jax both identify as being Health Enrollment Center when placing illegal autodialed and/or

prerecorded calls to consumers.

64.     There are also numerous examples online showing that Simple Health agents

called consumers using the name Health Enrollment Center. For example:

Female voice Robo call from the "National Health Enrollment Center" selling health plans which do not comply with Obamacare Affordable Care Act requirements. Call was then transferred to two men who work at Simple Health Plans, Inc. in the Fort Lauderdale/Hollywood Florida area. According to the Florida Department of State Division of Corporations, The National Health Enrollment Center is an inactive fictitious name. The telemarketers selling non—compliant ACA plans use names like National Health Enrollment Center, Health Enrollment Center, and National

[26]

## HII is Fully Aware of the Illegal Telemarketing Methods Used by its Brokerages

65.     Donisi Jax is a broker for HII.

66.     It is HII who provides the cloud-based system that Donisi Jax agents use,

which includes providing agents with insurance quotes and details, as HII does for its other

brokerages.

67.     One consumer wrote about the connection between Donisi Jax and HII when

she was transferred from Donisi Jax to HII:  "The email today stated it is from

hiiquote.com… The email state a copy of this letter was also sent to

info@nationwidehealthadvisors.com (d/b/a of Donisi Jax[27])[.]"[28] The consumer continued:

"I have yet to receive a refund of the initial 49.00 that was charged to my credit card account.

---

[26] https://800notes.com/Phone.aspx/1-213-204-4865/4
[27] https://www.bbb.org/us/fl/pompano-beach/profile/insurance-agency/nationwide-health-advisors-0633-90344592
[28] https://www.ripoffreport.com/reports/nationwide-health-advisors/tampa-florida-33613/nationwide-health-advisors-health-insurance-innovations-told-us-we-were-buying-health-i-1334881

**My credit card statement shows payment to HII**, (Health Insurance Innovations)[.]"[29] (emphasis added)

68.     HII cannot claim that it is, or was unaware of Donisi Jax's illegal telemarketing practices. In fact, a lawsuit was filed against both HII and Donisi Jax in 2017 alleging illegal telemarketing practices.[30]

69.     Despite the aforementioned lawsuit, Donisi Jax remained a registered broker for HII as of December 2018, if not longer.

**Responsibility of Chubb, NCE, Teladoc and ConsoliCare**

70.     Chubb, NCE, Teladoc, and ConsoliCare all benefit directly from the illegal telemarketing that is conducted either directly by or on behalf of HII.

71.     A cursory look online at the numerous complaints mounted against HII reveal a troubling pattern of behavior that all of the aforementioned companies were or should have been aware of.

72.     In continuing to conduct business using HII in a brokerage role itself, Chubb, NCE, Teladoc, and ConsoliCare have ratified the illegal telemarketing behavior and questionable business practices that HII uses to sell insurance packages.

73.     In fact, the Federal Communication Commission has provided instruction stating that sellers such as HII or Chubb, NCE, Teladoc, and Consolicare may not avoid liability by having their telemarketing outsourced:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activies to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United

---

[29] *id*
[30] Case 3:2017-cv-01127

States, as if often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC notes, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules, 28 FCC Rcd. 6574, at ¶ 37 (201).*

**Legality of Unsolicited Autodialed and Prerecorded Calls**

74.     As explained by the Federal Communications Commission ("FCC") in its 2012 order, the TCPA requires "*prior express written consent* for all autodialed or prerecorded [solicitation] calls to wireless numbers and residential lines." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG No. 02-278, FCC 12-21, 27 FCC Rcd. 1830 ¶ 2 (Feb. 15, 2012).

75.     Yet in violation of this rule, Defendant HII and or its brokerages fail to obtain express written consent prior to placing prerecorded and/or autodialed solicitation calls to cellular telephone numbers such as those of the Plaintiffs.

76.     In placing the calls that form the basis of this Complaint, Defendant HII utilized an automatic telephone dialing system ("ATDS" or "autodialer") in violation of the TCPA. Specifically, the hardware and software used by HII or its brokerages has the capacity to generate and store random numbers, and/or receive and store lists of telephone numbers, and to dial such numbers, *en masse*, in an automated fashion without human intervention. Defendant HII or its brokerages' automated dialing equipment also is, or includes features substantially similar to, a predictive dialer, meaning that it is capable of making numerous

phone calls simultaneously and automatically connecting answered calls to then available callers and disconnecting the rest (all without human intervention).

77.     There are thousands of complaints posted online about the many unsolicited, prerecorded and autodialed calls that consumers have received from HII brokerages, including many complaints from consumers that have their phone numbers registered with the DNC and who have asked for the calls to stop. As could be expected, many of the complaints show the great frustration these illegal calls have caused. This is a small sampling:

- "Called three times in 2 hours. I've received approximately 45 of these calls from different numbers in the past week. I'm really tired of it."[31]
- "I stayed on the line today after about the 100th call in two weeks and pressed 1 to talk to the guy. Asked him to be taken off the call list and he asked why….told him I had aout 800 calls from them and he got r-e-a-l-l-y snarky and told me 'you must be on our premium call plan and hung up on me[.]"[32]
- "Called me 50+ times per day and I constantly tell them to remove my phone number from the list; as soon as I do they hang up on me."[33]
- "Have been calling me for about 3 months and I block ever one of there numbers. I pressed 2 and it doesn't work! The funny thing is I'm only 14 and they want me to get there insurance. It is total harassment and very annoying!!!"[34]
- "somebody catch these people"[35]
- "These damn health insurance telemarketers are as bad as the evil auto warranty. Something has got to be done about this BS…before I take the matter into my own hands"[36]
- "These people keep calling – and leaving voicemails! I pressed 2 "to be placed on the do not call list" – but they still keep calling. I blocked the number but they can still leave automated voice mails – like 10 a day!!! You cannot get to a live person to tell them to stop either. So frustrating. I do't have time for their BS!!!"[37]
- "Health insurance scam. These pieces of sh*t call every single day, at LEAST 3 times

[31] https://800notes.com/Phone.aspx/1-217-450-9605
[32] https://800notes.com/Phone.aspx/1-505-210-7610/3
[33] https://www.bbb.org/us/fl/pompano-beach/profile/insurance-agency/nationwide-health-advisors-0633-90344592/customer-reviews#50914113
[34] https://800notes.com/Phone.aspx/1-458-209-2126/5
[35] https://findwhocallsyou.com/201-225-8495
[36] https://whocallsme.com/Phone-Number.aspx/7272050332
[37] https://800notes.com/Phone.aspx/1-980-242-3698

17

a day and it's a different number every day."[38]

78.     HII has shown an additional level of negligence by not insisting on a system whereby consumers would be removed from the calling lists of each brokerage once those consumers ask for the calls to stop.

79.     As part of its screening process for the brokers it uses, HII should have ensured each brokerage is scrubbing against the DNC and removing consumers so those consumers do not receive additional unwanted calls.

80.     HII should have also ensured it and its brokerages maintained an internal do not call system in order to ensure consumers would not received additional calls when they ask for the calls to stop.

## PLAINTIFF IZOR'S ALLEGATIONS

81.     On June 29, 2003, Izor registered his cellular phone number with the DNC in order to avoid receiving unsolicited telemarketing calls.

82.     Beginning in late 2018, Izor began to receive autodialed calls on behalf of Defendant trying to solicit the purchase of health insurance to his cellular phone.

83.     Izor made it abundantly clear that he was not looking to purchase insurance, but the calls continued.

84.     Izor notes that many of the calls he received were made using phone numbers that could not be called back, as Izor would find out that the numbers either belong to individual consumers, or the numbers were not in service. In other words, the calls came from spoofed phone numbers.

---

[38] https://800notes.com/Phone.aspx/1-980-734-3721

85.     On February 8, 2019, Izor received a call on his cellular phone from 520-462-7718 at 1:05 PM. When Izor answered, there was a noticeable pause before a live agent came on the line, indicating the caller's use of an autodialer.

86.     When the agent began the solicitation for health insurance, Izor repeated the fact that he did not want a health insurance quote and asked once again for the calls to stop.

87.     When 520-462-7718 is called, a live agent does answer identifying the company at first as being Health Enrollment Center. Based on an investigation conducted by Izor's attorneys, once it is time to pay for the health insurance, the company is identified as being Number One Health Insurance, with a phone number of 800-823-6229. The consumer then has their health insurance quote confirmed by Ryan Chadderton, an agent that is registered to sell insurance on behalf of HII. When payment is provided, the consumer receives an email and agreement direct from HII that the consumer is expected to sign.

88.     Izor does not have a relationship with HII or any of its affiliated companies, nor has he ever requested that any HII brokerage, or HII itself call him or consent to any contact from HII.

89.     Izor's cellular phone is not used for business purposes.

### PLAINTIFF HALE'S ALLEGATIONS

90.     On October 16, 2008, Hale registered her cellular phone number with the DNC in order to avoid receiving unsolicited telemarketing calls.

91.     Hale began to receive prerecorded calls from, or on behalf of, Defendant HII on her cellular phone in March of 2018.

92.     Hale received multiple calls, interrupting her work and use of her cellular

phone.

93.    For example, on March 12, 2019 Hale received 8 prerecorded calls from, or on behalf of Defendant HII to her cellular phone.

94.    Hale answered at least one prerecorded call on March 12 and at least two prerecorded calls on March 13, 2019. All of the calls that Hale received were to her cellular telephone.

95.    Hale specifically opted-out of receiving additional calls both by pressing the button that the prerecorded message indicated would end the calls, and also by asking a live agent to stop calling.

96.    Despite the opt-out requests, Plaintiff continued to receive prerecorded calls.



97.    As is shown in the screenshots above, Hale became so frustrated by the intrusive calls, she called HII or its brokerages on March 26, 2019 twice. In both instances, Hale opted-out of receiving calls from HII.

98.    Unfortunately for Hale, HII or its brokerages continued to place prerecorded calls to her cell phone.

99.    On April 2, 2019, Hale answered a prerecorded call from, or on behalf of, Defendant HII and pressed the button that would connect her with a live agent. The agent recognized Hale, referring to her by name, and proceeded to provide an insurance quote.

100.    Hale acted like she was interested in getting a quote in order to confirm the caller's identity. Once the insurance quote was provided, Hale agreed to purchase the plan and received an email direct from HII using the d/b/a MyBenefitsKeeper containing the insurance plan agreement:



101.    As has been established above, the plan Hale was quoted was on behalf of

ConsoliCare, offering insurance and/or supplementary insurance from Chubb, NCE and Teladoc. As part of the plan, Hale would be required to pay ConsoliCare, Chubb, NCE and Teladoc individually.

102.    In total, Hale received well over 35 prerecorded calls on her cellular phone from either HII, or HII brokerages, on behalf of the other Defendants despite repeated requests for the calls to stop.

103.    Simply put, Defendants did not obtain the prior express written consent to place solicitation telephone calls to Izor and Hale on their cellular telephones using an autodialer and/or prerecorded messages.

104.    The unauthorized telephone calls made by or on behalf of Defendants, as alleged herein, have harmed Plaintiffs in the form of annoyance, nuisance, and invasion of privacy, and disturbed the use and enjoyment of their phones, in addition to the wear and tear on the phones' hardware (including the phones' battery) and the consumption of memory on the phones.

105.    Seeking redress for these injuries, Izor and Hale, on behalf of themselves and Classes of similarly situated individuals, bring suit under the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*, which prohibits autodialed and unsolicited prerecorded telephone calls to cellular telephones and unsolicited calls to telephone numbers registered on the DNC.

## CLASS ALLEGATIONS

106.    Plaintiff Izor and Plaintiff Hale bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of themselves and all others similarly

situated and seek certification of the following seven Classes:

**Prerecorded Class:** All persons in the United States who from four years prior to the filing of this action (1) Defendants (or an agent acting on behalf of Defendants) called, (2) using a prerecorded message, and (3) for whom Defendants claim (a) they obtained prior express written consent in the same manner as Defendants claim they supposedly obtained prior express written consent to call Plaintiffs, or (b) they did not obtain prior express written consent.

**Autodialed Class:** All persons in the United States who from four years prior to the filing of this action (1) Defendants (or an agent acting on behalf of Defendants) called, (2) on the person's cellular telephone number, (3) using substantially similar equipment as Defendants used to call Plaintiffs, and (4) for whom Defendants claim (a) they obtained prior express written consent in the same manner as Defendants claim they supposedly obtained prior express written consent to call Plaintiffs, or (b) they did not obtain prior express written consent.

**Do Not Call Registry Class**: All persons in the United States who from four years prior to the filing of this action (1) Defendants (or an agent acting on behalf of Defendants) called more than one time on his/her residential telephone number, (2) within any 12-month period, (3) where the telephone number had been listed on the DNC for at least thirty days; (4) for the purpose of selling Defendants' products and services; and (5) for whom Defendants claim (a) they obtained prior express written consent in the same manner as Defendants claim they supposedly obtained prior express written consent to call Plaintiffs, or (b) they did not obtain prior express written consent.

**Internal Do Not Call Registry Class**: All persons in the United States who from four years prior to the filing of this action (1) Defendants (or an agent acting on behalf of Defendants) called more than one time on his/her residential telephone number; (2) within any 12-month period, (3) for the purpose of selling Defendants' products and services.

107.     The following individuals are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, their subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiffs' attorneys; (4) persons who properly execute and file a timely request for exclusion from the Classes; (5) the legal representatives, successors or assigns of any

such excluded persons; and (6) persons whose claims against the Defendants have been fully and finally adjudicated and/or released. Plaintiffs anticipate the need to amend the Class definitions following appropriate discovery.

108.    **Numerosity**: On information and belief, there are many hundreds, if not thousands of members of the Classes such that joinder of all members is impracticable.

109.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

(a) whether Defendants utilized an automatic telephone dialing system to make its calls to the Plaintiffs and the members of the Classes;

(b) whether Defendants placed calls to Plaintiff Hale and the members of the Classes using a prerecorded message;

(c) whether Defendants placed calls to Plaintiff Izor and the members of the Classes using an autodialer;

(d) whether Defendants systematically made multiple telephone calls to Plaintiff Izor, Plaintiff Hale and consumers whose telephone numbers were registered with the National Do Not Call Registry;

(e) whether Defendants made autodialed and/or prerecorded telephone calls to Plaintiffs and members of the Classes without first obtaining prior express written consent to make the calls;

(f) whether Defendants continued to make autodialed and/or prerecorded calls to Plaintiff Izor, Plaintiff Hale, and members of the Classes despite being asked to stop calling;

(g) whether Defendants conduct constitutes a violation of the TCPA or makes them vicariously liable for a violation of the TCPA; and

(h) whether members of the Classes are entitled to treble damages based on the willfulness of Defendants' conduct.

110.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in class actions. The Plaintiffs have no interests antagonistic to those of the Classes, and none of the Defendants have defenses unique to either of the Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Classes.

111.    **Appropriateness**: This class action is also appropriate for certification because the Defendants have acted or refused to act on grounds generally applicable to the Classes and as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final class-wide injunctive relief appropriate. Defendants' business practices apply to and affect the members of the Classes uniformly, and Plaintiffs' challenge of those practices hinges on Defendants' conduct with respect to the Classes as wholes, not on facts or law applicable only to the Plaintiffs. Additionally, the damages suffered by individual members of the Classes will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the members of the Classes to obtain effective relief from Defendants' misconduct on an individual basis. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**FIRST CLAIM FOR RELIEF**
**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff Hale and the Prerecorded Class)**

112.     Plaintiff Hale repeats and realleges paragraphs 1 through 111 of this Complaint and incorporates them by reference.

113.     Defendants or Defendants' agents transmitted unwanted solicitation telephone calls to Plaintiff Hale and the other members of the Prerecorded Class using a prerecorded voice message and/or are vicariously liable for such calls.

114.     These prerecorded voice calls were made *en masse* without the prior express written consent of Plaintiff Hale and the other members of the Prerecorded Class.

115.     Defendant HII has, therefore, violated 47 U.S.C. § 227(b)(1). As a result of HII's conduct, Plaintiff Hale and the other members of the Prerecorded Class are each entitled to a minimum of $500 in damages, and up to $1,500 in damages, for each violation.

**SECOND CLAIM FOR RELIEF**
**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff Izor and the Autodialed Class)**

116.     Plaintiff Izor repeats and realleges paragraphs 1 through 111 of this Complaint and incorporates them by reference.

117.     Defendants or Defendants' agents made unwanted solicitation telephone calls to cellular telephone numbers belonging to Plaintiff Izor and the other members of the Autodialed Class using equipment that, upon information and belief, had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator and/or are vicariously liable for such calls.

118.    These solicitation telephone calls were made *en masse* without the prior express written consent of Plaintiff Izor and the other members of the Autodialed Class.

119.    Defendant HII has, therefore, violated 47 U.S.C. § 227(b)(1). As a result of Defendant's conduct, Plaintiff Izor and the other members of the Autodialed Class are each entitled to a minimum of $500 in damages, and up to $1,500 in damages, for each violation.

### THIRD CLAIM FOR RELIEF
**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff Izor, Plaintiff Hale and the Do Not Call Registry Class)**

120.    Plaintiff Izor and Plaintiff Hale repeat and reallege the paragraphs 1 through 111 of this Complaint and incorporate them by reference.

121.    The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

122.    47 C.F.R. § 64.1200(e), provides that § 64.1200(c) is "applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers."[39]

123.    Any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" may bring a private action based on a violation of said

---

[39] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003) Available at https://apps.fcc.gov/edocs_public/attachmatch/FCC-03-153A1.pdf

regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object.  47 U.S.C. § 227(c).

124.     Defendants violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiff Izor, Plaintiff Hale, and the Do Not Call Registry Class members who registered their respective telephone numbers on the DNC.

125.     Defendants violated 47 U.S.C. § 227(c)(5) because Plaintiff Izor, Plaintiff Hale and the Do Not Call Registry Class received more than one telephone call in a 12-month period made by or on behalf of Defendants in violation of 47 C.F.R. § 64.1200, as described above. As a result of Defendants' conduct as alleged herein, Plaintiff Izor, Plaintiff Hale, and the Do Not Call Registry Class suffered actual damages and, under section 47 U.S.C. § 227(c), are entitled, *inter alia*, to receive up to $1,500 in damages for such violations of 47 C.F.R. § 64.1200.

<u>**FOURTH CAUSE OF ACTION**</u>
**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiffs and the Internal Do Not Call Registry Class)**

126.     Plaintiff Izor and Plaintiff Hale repeat and reallege paragraphs 1 through 111 of this Complaint and incorporate them by reference.

127.     Under 47 C.F.R. § 64.1200(d), "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

(1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

(5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for

5 years from the time the request is made.

128.    Defendant or its agent made autodialed and/or prerecorded marketing calls to Plaintiff and members of the Internal Do Not Call Registry Class without implementing internal procedures for maintaining a list of persons who request not to be called by the entity and/or by implementing procedures that do not meet the minimum requirements to allow Defendant to initiate telemarketing calls.

129.    The TCPA provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c)(5).

130.    Defendant has, therefore, violated 47 U.S.C. § 227(c)(5). As a result of Defendant's conduct, Plaintiff and the other members of the Internal Do Not Call Registry Class are each entitled to up to $1,500 per violation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Izor and Plaintiff Hale, individually and on behalf of the Classes, pray for the following relief:

a)    An order certifying the Classes as defined above; appointing Plaintiffs as the representatives of the Classes; and appointing their attorneys as Class Counsel;

b)    An award of actual and/or statutory damages to be paid into a common fund for the benefit of Plaintiffs and the Classes, together with costs;

c)  An order declaring that Defendants' actions, as set out above, violate the TCPA;

d)  An order requiring all of the Defendants to disgorge any ill-gotten funds acquired as a result of their unlawful telephone calling practices, or benefit gained from unlawful telephone calling practices;

e)  An injunction requiring Defendants to cease all unsolicited calling activity, and to otherwise protect the interests of the Classes; and

f)  Such further and other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs request a jury trial.

Respectfully submitted,

**PAUL IZOR** and **APRIL HALE**, individually and on behalf of all other similarly situated individuals

Dated: May 2, 2019

*/s/ Avi Kaufman*
Avi R. Kaufman* (FL Bar No. 84382)
kaufman@kaufmanpa.com
Rachel E. Kaufman (Florida Bar No. 87406)
rachel@kaufmanpa.com
Kaufman P.A.
400 NW 26th Street
Miami, FL 33127
Telephone: (305) 469-5881

*Trial Counsel*

Stefan Coleman (FL Bar No. 30188)
law@stefancoleman.com
Law Offices of Stefan Coleman, P.A.
201 S. Biscayne Blvd, 28th Floor
Miami, FL 33131
Telephone: (877) 333-9427

*Attorneys for Plaintiff and the putative Classes*